[No. 1565.]

## THE CHICAGO LUMBER CO. v. DILLON ET AL.

1. APPELLATE PRACTICE—BILLS OF EXCEPTION.

Where a bill of exceptions is prepared and tendered within the time limited, the party's rights are preserved and he cannot be prejudiced by a failure or neglect of the judge to sign or seal it within the time. And where a bill of exceptions was signed and filed within the time but the seal was omitted, the judge might add his seal after the filing and after the expiration of the time limited.

2. MECHANICS' LIENS—STATUTORY CONSTRUCTION.

The mechanic's lien act of 1893 did not apply to contracts or liens which had their inception prior to the time the act took effect   For such liens the statement might be filed under the old law although the act of 1893 was in effect at the time of filing.

3. MECHANICS' LIENS—MORTGAGES—PRIORITY OF LIEN.

Where two parties entered into a partnership agreement whereby one was to furnish the money to purchase town lots and to erect buildings thereon and to take title to himself, the other to superintend the building, the profits to be equally divided after paying the first party his money with interest, and the second party purchased lots, the grantor executing deeds to the first party and placed them in escrow to be delivered at any time within a year upon payment of the purchase price with interest, and the second party entered into an agreement with the grantor, whereby he obligated himself to erect buildings on the lots of not less than a fixed value, fixing the liquidated damages for a failure, and the buildings were erected during the time the deeds remained in escrow, and on the same day the deeds were taken out of escrow and placed on record the grantee executed a deed of trust to the lots, a mechanic's lien filed by the contractors who erected the buildings was a prior lien to the deed of trust.

4. MECHANICS' LIENS—STATEMENT—OWNERSHIP.

A mechanic's lien statement should be filed against the party who owns the land at the time the claim is filed and not the owner at the time the work was commenced, where the ownership is transferred between the time the work is commenced and the time it is concluded.

*Error to the District Court of Arapahoe County.*

Messrs. BENEDICT & PHELPS and Mr. HORACE PHELPS, for plaintiff in error.

Mr. L. B. FRANCE and Mr. A. B. SEAMAN, for defendants in error.

BISSELL, J.

As assignee of Barnett & Troutman, who were contractors and builders, the Chicago Lumber Company brought this suit to enforce a mechanic's lien which the contractors had filed on certain property in the city of Denver.   Part of the title must be stated to show the origin of the claims of the contractors and to determine their right to proceed under the statute.   As to some dates the record is not complete.   Prior to any of these dealings Mrs. Cordes was the owner of the lots.   For the convenience of the parties Mrs. Cordes executed three deeds to Frank S. Woodbury and put them in escrow. The date of the escrow is not certain, but the agreement between Mrs. Cordes and Peterson bears date February 24, 1893.   This is the date of the deeds and they were probably put in the bank at the time the negotiations between Mrs. Cordes and Peterson were completed.   Prior to these arrangements and the execution of the escrow Peterson and Woodbury made a contract.   This bears date of February 20, 1893, and recites that there had been placed in escrow three deeds on certain lots by Feldhauser to Woodbury, whereby it had been provided that the deeds could be taken up on or before a year from date with interest at seven per cent and then proceeded, that it was agreed between Peterson and Woodbury that Peterson should erect one or more houses on the ground, superintend the construction and O. K. the bills, all of which Woodbury was to pay and charge interest thereon at the rate of ten per cent until the buildings were sold or the money otherwise provided.   It was further agreed that Peterson and Woodbury should divide the profits that might arise from the sale of the houses or any portion of the ground. Recalling the agreement between Mrs. Cordes and Peterson, which was probably filed with the deeds, it was therein recited that Mrs. Cordes agreed to sell the lots for $10,000 which

Peterson agreed to buy, and that the lots were bought for building purposes. Then follows this somewhat significant language: "As a convenience to him, the following conditions to the above agreement are entered into." Mrs. Cordes then agreed to deposit three deeds to separate portions of the property running to Frank S. Woodbury. The lots covered by each deed were described, and it was provided that the second deed should be taken out first, although the same right to take up at any time within a year attached to all three. This was followed by a recital that it was mutually agreed that Peterson was to expend at least $8,000 in the erection of a house on lots conveyed by the second deed. There was no condition to build on the other lots, although it was agreed the contracts should be regarded as an entirety, and there was a stipulation for liquidated damages on both sides. This contract was signed by Mrs. Cordes and by Peterson. After these arrangements were completed, Woodbury and Peterson acting under their original partnership contract, as it may be not inaptly termed, proceeded to build. They put up two houses. We are now only concerned with one. In erecting it and in making the improvements, grading, etc., $8,675 was spent. Barnett & Troutman did most of the work. It is a matter of controversy when their work was completed. We do not intend to decide this precise question or indicate our opinion respecting it because it is a matter of considerable consequence in the further progress of this litigation. One of the contractors testified that they were doing work in October and as late as the 6th and 7th, and possibly, the 21st of November. The importance of this matter will appear when we state the contention of the appellees that the work was finished so long before these dates that the lien was filed too late to preserve the contractors' rights. What the facts are we do not know. The court made no finding thereon. During the trial the plaintiff offered in evidence the lien filed against this property and the one involved in the other suit. Both cases were tried together although two separate judgments were rendered. The

liens were rejected because the contractors had not complied with the law of 1893 in perfecting them. When they were ruled out the company necessarily failed in their action. If they were fundamentally bad they could not be enforced. This is all of the record to which we need advert, except one or two matters which will appear in the progress of the opinion.

At the threshold of the case it is urged that this court may not consider the record because there is no proper bill of exceptions. The plaintiff saved exceptions to the judgment, took time to file a bond and the bill, and thereafter and within the time limited and on May 5, 1895, tendered it to the trial judge. This tender is not questioned. The judge signed it but did not attach his seal. The bill was filed and thereafter the judge sealed it. The defendants insist the judge could not seal it after it had been filed, and that the plaintiff is remediless. We do not so understand the practice. As the rule has been expressed by the supreme court, had the bill come up in its original condition leave would have been given the plaintiff to withdraw it to permit the judge to affix his seal. It is well settled that wherever the judge marks the date of the tender which is within the specified time, although it may not be signed or sealed until after this time has gone by, the tender and the indorsement protect the plaintiff's rights. The judge may after the time limited properly authenticate the bill. It is likewise true the bill may be withdrawn to have the seal affixed. The seasonable tender preserves the party's rights and he may not be prejudiced by the failure or neglect of the judge to sign or seal it. This proposition must be resolved against the defendants. *Fechheimer v. Trounsteine,* 12 Colo. 282; *Williams v. The People,* 25 Colo. 251.

We now come to another proposition which may be well disposed of at this point. The lien act has been subject to divers amendments. The act of 1883, General Statutes, 1883, sections 21 to 31 *et seq.*, was in force until 1889. Its validity is unquestioned, and its terms and conditions have been

tolerably well settled. The act was amended in 1889 and this amendatory act has been very much questioned by counsel and by the *nisi prius* courts. We find an opinion by Judge Bentley incorporated into the record whereon counsel seek to question the constitutionality of the act. We do not deem it necessary to decide it. If the act be constitutional the lien was good. If it was unconstitutional, it was still good under the act of 1883. The act has been repealed by another act passed in 1893, and we therefore deem it neither incumbent on us nor wise to consider this troublesome question. If the parties had a right to file the liens under either one or the other of those acts, they are good no matter under which they may have proceeded. We dismiss this question with these observations.

We now come to the principal proposition respecting the validity of these liens. They were not filed under the act of 1893. The force and effect of this later act and the cases to which it is properly applicable have heretofore been before this court for consideration. The first case in which it came under examination was *Orman v. The Crystal River Ry. Co.*, 5 Colo. App. 493. The next was *Small v. Foley*, 8 Colo. App. 435. In the first the question presented concerned the time when the suit should have been begun. The court decided, speaking through me, that it was quite within the power of the legislature to alter the time within which a suit might be commenced by an act which took effect after the lien accrued but before the right to sue arose. In common with most of the authorities we held that the time when a suit should be brought was a matter of procedure and within the control of the legislature so long as reasonable time was provided. This was the sole question in the case. An expression is found in the opinion which was possibly liable to misconception and which seems to have been misunderstood by the trial court. It was construed as an adjudication that as to the form and substance and as to the procedure necessary to preserve the lien, the act of 1893 must be followed. This was not the purpose of the decision nor was it within

the proposition evidently decided. Subsequently the direct question came up in the *Small* case, and in that as in this, counsel contended that the question was settled by *Orman v. The Crystal River Ry. Co.* After a careful examination the court, while agreeing with the proposition decided in the *Orman* case, held that the act of 1893 was not applicable to contracts or liens which had their inception prior to the time the act took effect. We are really not of the opinion that the very astute counsel who tried this case for the defendants were misled by the first decision, although they observe that it may be said with some justness, the incidental remark of the judge in the *Orman* case was unfortunate. The trouble is, that in the application of the *Orman* case due attention was not paid to the matter in issue and to the precise proposition decided. I am quite ready to accept the criticism, but I must be permitted to observe that it is not always possible to so write that he who runs may read, nor are we always able to lay out what the poet prophet Isaiah described in the 8th verse of the 35th chapter of his book, a highway along which all men may pass and on which even the wayfaring man may not err. At all events, whether the criticism be or be not justified, the question has been put to rest by the *Small* case. Accepting that decision, these lien statements need not have been filed under the act of 1893. The parties had the right to file them under the act of 1883 or 1889, under either one of which the statements were in form and substance sufficient, providing otherwise the contractors were able to maintain them by proof.

We are now brought face to face with the defendants' theory that under the acts of 1883 or 1889, or either one, Woodbury had no title which could be incumbered by a lien and that the defendants therefore have a right to insist upon their security which must be preferred to the lien even if it was properly filed and is held good. To understand this question a matter must be stated which has been reserved to the present that it may be more clear. Woodbury's deed was not taken out of escrow nor was it put on record until the

28th day of December, 1893. The consideration money was then paid and the deed filed for record. It is found in book 931, page 387 of the county records. On the same day, though not exactly concurrent in record, Woodbury gave a trust deed to John J. Dillon for the use of Thomas F. Dillon for $8,000. This is recorded in book 955, page 182. The Dillons insist their trust deed has priority over the lien of Barnett & Troutman, even assuming that they filed it in apt time. In other words, the defendants contend that even though it be conceded work was done as late as the 21st day of November whereby the filing would be timely, yet no lien was thereby given because the trust deed was executed on the day that the title passed to Woodbury by the payment of the purchase price and the lifting of the deed. They further maintain that the circumstances of the case show that Peterson was not Mrs. Cordes's agent and the improvements were made while Woodbury had no title which could be made the subject of the lien. We do not believe either proposition is accurately put. We are not clear about the effect of the contract between Mrs. Cordes and Peterson, nor do we find it necessary to determine the rights of the parties thereunder. The contract was executed and the deeds delivered when the consideration money was paid and probably regardless of the fact whether the houses had or had not been erected. According to the agreement between Mrs. Cordes and Peterson the escrow was not dependent on the performance of this condition. The agreement was made as it recited for the convenience of Peterson. The sale was in no sense dependent on the improvement of the property. As we look at it Peterson or Woodbury could have gone to the bank at any time within the year, tendered the purchase price and gotten the deed and put it on record whether the houses had or had not been erected. This is an unimportant inquiry although we regard it as indicative of the real situation. However that may be, the houses were built, and if the building was a condition precedent it was complied with, and when the consideration was paid Woodbury was entitled to a deed. Just

why the escrow agreement was made between Mrs. Cordes and Peterson does not transpire. The real party in interest, the one who paid the money, who was expected to advance whatever was necessary either to pay for the property or to erect the houses, was Frank S. Woodbury. It appears by the very terms of the agreement between Peterson and Woodbury that there were two sides to it; by one of which Peterson was to superintend the construction and O. K. the bills, and by the other Woodbury was to pay them. Peterson acquired no interest either in the lands as paid for or in the houses as built. He was only interested in the resultant profits when either the lots or the houses or both should be sold. He was simply to share the profits as his compensation for supervising and superintending the work. We therefore conclude that by the terms of the arrangement as well as by the advancement of the money, Woodbury became the owner at the time he got the deeds and during all the time from the placing of the deeds in escrow to the time the money was paid and the deeds taken out, he had an equitable interest in the property. It was an interest which ripened into a fee title when the deeds were delivered, and by relation and for the purposes of a lien may be not inaccurately said to have vested as of the date of the contract. He could at any time on tendering the purchase price have compelled a conveyance. This Peterson could not have done, nor as we look at it could he ever have substituted other deeds because the money was paid by Woodbury, and if Woodbury furnished the funds Peterson would never have been permitted in a court of equity to acquire title by the payment of the purchase price and thereby reap the advantage of the improvements. The equitable interest was outstanding from the time these deeds were put in escrow and it grew and increased from time to time as the houses were built, and was an interest which belonged to Woodbury which he could at any time have enforced and against which Peterson would not have been permitted to assert any right.

The defendants insist, however, that under the statute the

contracts must have been made either with the owner or with their agent, and since they were made with Peterson although Woodbury furnished the money, yet Mrs. Cordes would not be bound nor would Woodbury.   Neither position seems to us well taken.   In the first place if the escrow agreement had never been carried out and the lots had been improved, we do not believe, although it is a question which we do not decide, that Mrs. Cordes could have kept the lots and the improvements without accounting to the contractors for the liens which they might have filed.   To that extent at least Peterson was her agent, and she would have been bound to the contractors for these improvements since she consented to their erection while she held title.   On the other hand, since by contract Peterson was Woodbury's agent by appointment Woodbury would be bound.   He would take the title *cum onere* and must answer for the unpaid bills contracted in putting up the buildings.   We thus see, that in one case Peterson was the implied agent of the one in whom the fee stood, and in the other the actual agent of the one to whom the deed ran and in whom the title ultimately vested. Thus in any event the property would be bound and the contractors' rights secured.   As we look at it, under the terms of our statute the title which Woodbury had was included within its terms.   Under a statute precisely like it, which provided that any person having an assignable, transferable or conveyable interest or claim in or to any land, shall be deemed an owner, the supreme court of the United States held that one having an apparent equitable interest was an owner for the purposes of the act.   In this state an equitable title of a similar nature has been held subject to mechanics' liens.   *Bear Lake Irrigation Co. v. Garland,* 164 U. S. 1; *Shapleigh v. Hull,* 21 Colo. 419; *Chicago Lumber Co. v. Fretz,* 51 Kan. 134; *Mulvane Lumber Co. v. Chicago Lumber Co.,* 56 Kan. 675.

In the federal case neither the contracting parties nor the contractors ever had any title or interest in the land except subject to the completion of the ditch whereon the lien was sought.   The work was done by the contractors and there-

upon and thereby the title vested in the company. The supreme court held the Bear Lake Company was an owner. These cases cited are well considered, and being under similar statutes we regard the matter, when coupled with the decisions of our supreme court, as fully settled.

The point which the defendants urge, that the lien was not filed against the owner, is not well taken. A lien should be filed against the one who owns at the time the claim is filed, or in whom it may have vested between the time the work was commenced and its conclusion. The owner is not necessarily the one who owns at the time the work is begun. The title may be transferred. The doctrine of relation has a limited application to the question of ownership. As said by the supreme court, it is a fiction adopted to cut off claims against the lien asserted on behalf of interests or title which may accrue intermediate the commencement of the work and filing the lien. The owner is the one in whom the title stands when the claim is filed. He is the owner for the purposes of the statement. The owner has been held to be the one who is to be affected by the lien, and not necessarily the one who authorized the improvement. They may be one and the same person, or they may be different persons. Under the act of 1893, which would be the owner for the purposes of notice, we do not decide. All we intend to decide in this case is that Frank S. Woodbury was the owner within the statute at the time the work was done and at the time the lien was filed. We do not regard the ownership of Mrs. Cordes as at all important in the determination of the question. *Corbett et al. v. Chambers et al.*, 109 Cal. 178; *Rice v. Carmichael et al.*, 4 Colo. App. 84.

Great stress has been laid by the defendants on the consideration that this is a suit in equity and the court is bound to determine the rights of the parties wholly on equitable considerations. This we think we have done. As the record stands, the Dillons are in no sense innocent parties, nor so far as the proof goes and so far as their pleadings go, are they persons who took a security without notice or knowledge

and. therefore with superior rights and equities to the lien claimants. As the matter is set up in their fifth defense, they were fully advised of the situation of the title when they loaned their money and had full cognizance of the facts respecting the erection of the improvements and the accretion of mechanics' liens. By what is termed by them a cross-complaint, it appears they paid off divers liens to the B. L. James Company, to Worcester, or his assignee, and to various others amounting to $1,000 or $1,200. They likewise aver that when they advanced the money secured by the trust deed they did not pay the whole amount of it to Woodbury but retained $1,577.70, which they held subject to this lien claim and the litigation which might grow out of it. They have demonstrated by their own pleading that they had knowledge of the claim of Barnett & Troutman and when they loaned the money intended to hold out enough to satisfy the supposed amount of their claim. It would therefore be true, even under equitable considerations, that if the lien had been adjudged invalid the plaintiff ought to have had the right to compel them to turn over to him the $1,577.70 which they retained to protect the title. To that extent in any event, the liens, if they have any validity, would be superior in equity to the claims of the Dillons for the enforcement of their security. This may be wholly unimportant, and if the liens are adjudged good it is of no consequence, but it is simply stated to show that on the ultimate judgment, even though they are compelled to pay the amount of the lien, $2,167, they have fairly and substantially protected themselves like prudent business men by withholding a sum almost sufficient for the purpose. What we state in regard to this matter is more in answer to the arguments of counsel, that it would be inequitable to adjudge the lien good, than because it is an essential proposition on which the opinion rests.

As already suggested, we leave undecided what may possibly become a very important question, the character of the work which was last done by the contractors. This is a matter of fact which the lower court must determine on evi-

dence, towards which the proof was not so directed that we are able to settle the question. We are familiar with the rule that work which is colorable and not done under and in pursuance of the contract is by many authorities held inadequate to keep alive the right of the contractor to file a lien. How far and to what extent if at all the contractors' rights would be limited if the work is colorable we do not undertake to determine. In advance of proof to the proposition we cannot decide it.

The court erred in refusing to admit the liens in evidence, and for this error the case must be reversed.

*Reversed.*